UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARGARITA CRUZ, o/b/o LUIS FONSECA, :
DECEASED, :
    Plaintiff, :
        :
    v.    :  C.A. No. 14-526ML
        :
CAROLYN W. COLVIN, ACTING :
COMMISSIONER OF SOCIAL SECURITY, :
    Defendant. :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

   This matter is before the Court on Plaintiff's motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act").  Because Plaintiff's son, the original claimant, Luis Fonseca, tragically died for reasons not disclosed in the record, Tr. 205, before the Appeals Council decision, only Plaintiff's DIB appeal remains pending.[1]  Plaintiff contends that the Administrative Law Judge ("ALJ") committed reversible error by failing properly to evaluate the opinions of a physician and a psychologist, both of whom opined based

---

[1] The Appeals Council correctly dismissed Plaintiff's application for SSI benefits as moot because such benefits are payable only to certain of a deceased adult claimant's specifically identified survivors.  20 C.F.R. §§ 416.542(b)(1), (2), (4); Wasilauskis v. Astrue, No. 08-284, 2009 WL 861492, at *3 (D. Me. Mar. 30, 2009) (as a matter of law, claim for SSI not payable where decedent left no eligible survivor); Hill v. Barnhart, No. CV-7:05-166, 2006 WL 910010, at *1 (W.D. Va. Apr. 6, 2006) (dismissing appeal of SSI denial as moot where claimant left no eligible survivor).  In her attempt to resurrect the SSI claim on appeal, Plaintiff concedes that her son did not have an eligible substituted party for the SSI claim, arguing instead that her "request for review is not moot relative to the SSDI application," citing 20 C.F.R. § 404.503(b).  This argument is inapposite.  Plaintiff's reference to an SSDI regulation relates to her son's DIB claim, not his SSI claim: "DIB and SSDI are synonymous with each other, however DIB and SSDI are not to be confused with [SSI].  The legal standards applied to SSI and DIB/SSDI are the same, but separate, parallel statutes and regulations exist for SSI and DIB/SSDI claims."  Gordon v. Colvin, No. 4:11-40104-TSH, 2013 WL 5347509, at *1 n.2 (D. Mass. Sept. 11, 2013).  It is undisputed that the DIB claim remains viable, despite Mr. Fonseca's death.  Based on the foregoing, I recommend that this Court affirm the dismissal of the SSI claim.  It will not be discussed further in this report and recommendation.

on one-time consultative examinations.  Defendant Carolyn W. Colvin ("Defendant") has filed a

motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended

disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find no

material legal error and that the ALJ's findings are well supported by substantial evidence.

Accordingly, I recommend that Plaintiff's Motion to Reverse with a Remand for Rehearing of

the Commissioner's Final Decision (ECF No. 7) be DENIED and Defendant's Motion for an

Order Affirming the Decision of the Commissioner (ECF No. 10) be GRANTED.

## I.   **Background Facts**

### A.   **Plaintiff's Relevant Background**

A "younger" claimant, Luis Fonseca was twenty-seven years old at the time of his

alleged disability onset date.  Tr. 47.  He had an eleventh grade education and past work

experience as a roofer, assistant retail store manager, busboy and hotel houseman.  Tr. 193-202,

213.  His roofing job lasted for several years and yielded income of up to $26,000 in 2006.  Tr.

198-99.  After an interruption due to hernia surgeries in 2009 and part of 2010, Tr. 51, 193, he

worked for a year and a half as an assistant store manager, earning as much as $8,500 in 2011.

Tr. 48, 194.  Although the medical record reflects that the surgery was over a year later, he

testified that he stopped working at the alleged onset of disability on July 15, 2011, because of

heart surgery.  Tr. 22, 48-49.

As the ALJ found, Mr. Fonseca suffered from serious heart issues.  Tr. 25.  Severe mitral

regurgitation resulted in major surgery at Rhode Island Hospital on August 1, 2012.  Tr. 298.

Soon after, Mr. Fonseca was rehospitalized for fever and possible pericarditis.  Tr. 300-03.  He

also was treated with blood thinners for atrial fibrillation ("Afib").  Tr. 332.  The heart surgery

incision resulted in a ventral hernia that had to be surgically repaired on April 26, 2013.  Tr. 404.

Mr. Fonseca's high blood pressure was treated with various medications.  Tr. 270.

Notwithstanding Mr. Fonseca's persistent complaints, the medical record reflects that this

treatment was efficacious.  For example, at a January 29, 2013, appointment at the Rhode Island

Hospital ("RIH") Medical Primary Care Unit, he told one of his primary care providers that he

was "same old, same old," with no new concerns, no complaints, no numbness, weakness, chest

pain or other neurological symptoms.  Tr. 347.  By August 2013, his cardiologist described his

cardiac condition as stable and, in September 2013, his echocardiogram revealed only mild

mitral regurgitation.  Tr. 641-43.

Apart from cardiac impairments, Mr. Fonseca complained of pain.  He went several times

to the emergency room complaining of chest pain, numbness, weakness and headache, resulting

in consideration by emergency room staff of transient ischemic attack ("TIA") or complex

migraine.  All of the objective testing done during these visits resulted in largely normal brain

findings.  Tr. 476-78 ("no acute intracranial pathology"); Tr. 482-93 (MRI brain is negative;

kidney stone diagnosed, but "urology feel stone will be able to be passed"); Tr. 624-30 (physical

examination normal).  During one of these visits, Mr. Fonseca left the hospital against medical

advice and did not seek further treatment.  Tr. 624, 630.  Although some records refer to a

history of TIA or migraine, e.g., Tr. 494, 640, it is not clear whether either was ever conclusively

diagnosed.  These complaints of chest pain are complicated by repeated references to opioid

dependence, including the suggestion that Mr. Fonseca's complaints of pain were exaggerated to

induce providers to prescribe opioids.  For example, on November 27, 2012, Dr. O'Brien noted

that he complained of pain, could not describe its "quality nor severity" and became angry and

aggressive when the doctor resisted prescribing an opioid to treat it.  Tr. 351-52 (warning that

"he was taking dangerous combinations of medications . . . and that he is at risk of injury, respiratory/ CNS depression or even death if he continues in his present pattern").  Similarly, at a January 29, 2013, appointment with Dr. O'Brien at the RIH Primary Care Unit, the record reflects a confrontation with Mr. Fonseca regarding the Pain Committee's decision to refuse further opioid prescriptions because he had been seeing multiple providers seeking opioid prescriptions (such as complaining of pain at emergency rooms and to an urgent care provider), his false denial of marijuana use as demonstrated by a positive drug screen, his procurement of prescriptions for benzodiazepine from multiple providers (a pattern flagged by the Rhode Island Assistance Program), and other "multiple red-flags for misuse or abuse of [opioid] medication." Tr. 347-49.

Mr. Fonseca's other complaint of pain focuses on his back, which he began to mention in late 2013.  At first, it appeared to be related to other conditions.  Tr. 483-85 (September 2013 complaint of back pain leads to discovery of kidney stone).  Then, in October 2013, an MRI disclosed "degenerative changes of the spine."  Tr. 580.  And in December 2013, a second MRI resulted in the diagnosis of disc protrusion; the treatment note arising from this diagnosis states, "back pain . . . well controlled on Flexeril."  Tr. 593, 636.  At the hearing, Mr. Fonseca testified that he had recently begun treating with a Dr. Hendell, who said he would need back surgery. Tr. 55.  There is no record reference to such a recommendation.

Although Mr. Fonseca's claimed mental impairments are a critical component of his appeal, his mental health treatment record is limited.  For most of the relevant period, he was treated for depression and anxiety by the prescription of medication by providers at the RIH Primary Care Unit; after he switched primary care providers from RIH to Dr. Mason of Anchor Medical, he apparently continued to be prescribed medication to treat depression.  Tr. 270, 315.

Apart from medication, there is no treating record reflecting any psychiatric evaluation, hospitalization,[2] therapy or other mental health treatment.  The few record references to the effectiveness of treatment suggest that his symptoms were controlled by medication.  See, e.g., Tr. 316 ("occasional anxiety outburst controlled by lorazepam"); Tr. 642 ("Psychiatric – negative").  One notable aspect of Mr. Fonseca's mental health treatment is the increasing discomfort of the RIH Primary Care Unit team about prescribing mental health medications (particularly benzodiazepines) without a psychiatric evaluation.  Tr. 318, 349.  Mr. Fonseca kept assuring them that he had an appointment at the Providence Center.  Tr. 349, 354.  Dr. O'Brien expressed skepticism – "it is also unclear at this time from Mr. Fonseca whether this was an actual psychiatry appointment."  Tr. 354.  At the hearing, Mr. Fonseca testified that he had seen a counselor at the Providence Center twice in 2013 and did not return because "[t]hey're booked." Tr. 64-65.  However, his attorney confirmed that there are no Providence Center treating records. Tr. 65.

Also pertinent to the claim of disabling mental health impairments are the record references to Mr. Fonseca's mental status.  With no treating mental health provider involved with Mr. Fonseca's care, these are found in the notes pertaining to treatment of his physical issues. None of them reflect any negative mental health findings.  See, e.g., Tr. 277 ("Awake, alert, oriented x 3 with normal speech and mentation"); Tr. 306 ("Alert and oriented x3, no acute distress"); Tr. 422 ("Psych: Behavior, mood, and affect are within normal limits"); Tr. 441 ("pleasant, NAD"); Tr. 450 ("Behavior is cooperative"); Tr. 490 ("Psych: Negative for

---

[2] The record does refer to one mental health hospitalization (Tr. 322) in the past that apparently was reported by Mr. Fonseca to a provider at the RIH Primary Care Unit, although Mr. Fonseca told Dr. Armesto that he had never been psychiatrically hospitalized (Tr. 384) and Plaintiff does not dispute the ALJ's finding that there is "no evidence in the record of any in-patient hospitalization due to a mental impairment."  Tr. 32.

depression, anxiety, suicide ideation, homicidal ideation, and hallucinations. . . . Awake, alert, with orientation to person, place and time. Behavior, mood and affect are within normal limits.").

### B.    Opinion Evidence

On December 15, 2012, shortly before the RIH Primary Care Unit confrontation regarding opioids, benzodiazepine and marijuana, Tr. 349, Dr. Daniel Harrop performed an examination and provided physical and mental opinions, apparently at the request of the Rhode Island Department of Human Services.   Tr. 333.   Apart from a mental status examination, the report does not describe what sort of physical examination, clinical techniques or tests Dr. Harrop employed, if any, or whether he reviewed any of the medical record.   Tr. 337-41.   There is no indication that Mr. Fonseca disclosed to Dr. Harrop the pattern of seeking opioids and benzodiazepine from multiple providers, or his ongoing use of marijuana.   In his report, Dr. Harrop opined that, due to "cardiac problems," Mr. Fonseca could sit for four out of eight hours, stand and walk for less than two hours, occasionally lift and carry up to ten pounds, occasionally bend/stoop, and frequently reach and bend.   Tr. 333-35.   Dr. Harrop also concluded that "emergency" cardiac surgery and related medication had caused "permanent" cognitive damage, which was coupled to a longstanding history of depression and psychosis, resulting in marked or severe limitations in virtually every mental functional category.   Tr. 335, 342.

On April 4, 2013, psychologist Dr. Jorge Armesto performed a consultative examination of Mr. Fonseca at the request of Disability Determination Services ("DDS").   Based on a clinical interview, record review and results from cognitive and achievement testing, Dr. Armesto found appropriate orientation to person and time, but not place, coherent thought processes, grossly intact concentration and attention, normal speech, sad, nervous and anxious affect/mood, no current suicidal or homicidal ideation, no evidence of delusional or psychotic thinking, some

memory problems, and decreased psychomotor functioning.  Tr. 385-88.  Mr. Fonseca described

feeling "lost" and reported a history of fire setting and self-mutilation, primarily through self-

tattooing and at least one instance of burning himself with an iron, as well as past auditory

hallucinations.  Tr. 387.  Testing revealed a below-average non-verbal intelligence quotient (IQ)

of 82, with significant weakness in reading, sentence comprehension, math computation, and

spelling.  Tr. 385-86.  Dr. Armesto assessed Mr. Fonseca's cognitive functioning with an

MMSE-2 standard score of 98 and global assessment of functioning with a GAF score of 47.[3]

Tr. 387-88.  He diagnosed mood disorder, anxiety disorder, marijuana abuse, learning disorder

and personality disorder and opined that the "ability to respond to customary work pressures is

impaired."  Tr. 385, 388.

On April 11, 2013, state agency psychologist Dr. Michael Slavit reviewed the entire

record, including Dr. Armesto's test results, and concluded that the personality disorder was

severe, while anxiety, depression, learning and substance abuse disorders were all non-severe; he

opined that Mr. Fonseca could perform routine tasks for two-hours at a time for a total of eight

hours, and could manage brief, superficial interactions in a work setting.  Tr. 82-83, 94-95.  In

September 2013, state agency psychologist Dr. Jeffrey Hughes reviewed the entire record again

on reconsideration and opined to the same conclusions.  Tr. 110-11, 125-26.

On April 25, 2013, state agency physician Dr. Yousef Georgy reviewed the record as of

that date; focusing on the "good result" with the mitral valve repair, he concluded that none of

Mr. Fonseca's physical impairments were severe and did not prepare an RFC opinion.  Tr. 79.  In

---

[3] A Global Assessment of Functioning ("GAF") score of 47 is within the 41-50 range, which indicates "serious impairment in social, occupational, or school functioning."  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR").  It bears noting that by the time of Dr. Armesto's report, the DSM had eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")).  The MMSE-2 is the "Mini-Mental State Examination-Second Edition."  See Elmore v. Colvin, No. CIV.A. 1:14-4144-RMG, 2015 WL 5178458, at *6 (D.S.C. Sept. 4, 2015).

October 2013, state agency physician Dr. Phyllis Sandell reviewed the record on reconsideration; she found that both heart disease and recurrent arrhythmias were severe impairments. Tr. 120. Nevertheless, she opined that Mr. Fonseca could lift and carry fifty pounds occasionally, and twenty-five pounds frequently; could sit, stand and/or walk for six hours out of an eight-hour workday; could never climb ladders, ropes or scaffolds; and needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and even moderate exposure to hazards such as machinery and heights. Tr. 107-09, 122-24.

## II.  Travel of the Case

Mr. Fonseca filed DIB and SSI applications on October 25, 2012, alleging that he was disabled as of July 15, 2011. Tr. at 180-92. They were denied initially, Tr. 74-99, 133-36, and on reconsideration. Tr. 100-31, 138-43. On March 13, 2014, the ALJ held a hearing at which Mr. Fonseca, who was represented by counsel, appeared and testified, as did a vocational expert ("VE"). Tr. 41-73. On April 15, 2014, the ALJ issued a decision finding that Mr. Fonseca had not been disabled at any time since July 15, 2011, and was therefore not entitled to receive benefits. Tr. 19-40. While review of the ALJ's decision was pending before the Appeals Council, Mr. Fonseca died, see Tr. 205, after which his mother, Margarita Cruz, was substituted for him. On October 10, 2014, the Appeals Council dismissed the SSI claim based on Mr. Fonseca's death and denied the request for review of the DIB denial. Tr. 1-7. This appeal followed.

## III.  The ALJ's Hearing and Decision

At his March 13, 2014, hearing, Mr. Fonseca testified that he lived with his parents, did not drive at all,[4] performed almost no activities of daily living and spent most of his day lying

---

[4] This testimony is contradicted by the medical record. See Tr. 345 (complains of dizzy spell while driving); Tr. 494 (drove to RIH emergency).

down.  Tr. 47, 55-56 ("I get tired out very fast.  As soon as my heart rate is high, once it gets to a certain point it drops and it drops my, I just get tired.").  His physical impairments caused anxiety and depression, for which he took medication.  Tr. 64.  He claimed he saw a Providence Center counselor twice,[5] but also testified that he had never had mental health treatment other than medication.  Tr. 64.  Mr. Fonseca said that he had difficulty concentrating and remembering things and that he had friends with whom he interacted over Facebook or by phone.  Tr. 66.  He admitted that he smoked marijuana daily up until three or four weeks prior to the hearing.  Tr. 67.  In testimony whose accuracy was challenged by the ALJ on the record,[6] Tr. 60, he claimed never to have been advised that tobacco and marijuana could be dangerous for him until he initiated care with Dr. Sadaniantz in August 2013.  Tr. 59-61.  In response to questions from his attorney, he testified that the lack of mental health treatment was due to his setting treatment for cardiac and neurologic symptoms as the priority over psychiatric treatment.  Tr. 68.

Based on hypothetical questions from the ALJ, the VE testified that an individual of Mr. Fonseca's age, education and work experience, limited to medium work, with no climbing or exposure to irritants or hazards, understanding, remembering, and carrying out simple, routine, repetitive tasks with the need for breaks every two hours, and no interaction with the public and only work-related interaction with co-workers and supervisors, would be unable to perform Mr. Fonseca's past relevant jobs, but would be able to perform assembly jobs that existed in significant numbers in the regional and national economy.  Tr. 71.  However, if the individual

---

[5] The accuracy of this testimony is questionable.  See Tr. 65 (attorney confirms no Providence Center treating record); Tr. 354 (RIH provider skeptical about whether "actual psychiatry appointment").

[6] The medical record reflects many warnings and discussions about the dangers of tobacco and marijuana.  See, e.g., Tr. 305 ("stop tobacco and marijuana and avoid all recreational drugs"); Tr. 320 (questioned about smoking and readiness to quit; marijuana use denied).

also needed to be off-task for one hour during the workday, the VE testified that there would be no work.  Tr. 71-72.

The ALJ issued his decision under the familiar five-step sequential evaluation process. At Step One, he found that Mr. Fonseca had not engaged in substantial gainful activity since July 15, 2011, his alleged onset date.  Tr. 25.  At Steps Two and Three, the ALJ found that heart disease and arrhythmias, as well as personality, affective, anxiety-related, and learning disorders, were all severe impairments, but that none of them met or medically equaled the requirements of any Listing.  Tr. 25-26.  In reliance on the medical evidence and on his unchallenged finding that Mr. Fonseca's statements were not entirely credible, the ALJ determined that Mr. Fonseca retained the residual functional capacity ("RFC")[7] to perform medium work with all the limitations laid out in the ALJ's primary hypothetical (that is, excluding the need to be off task for an hour a day).  Tr. 28.  After finding at Step Four that Mr. Fonseca could not perform his past relevant work, the ALJ relied on the VE to conclude that jobs existed in significant numbers in the regional and national economy that Mr. Fonseca could perform.  Tr. 33-34.  Based on these findings, the ALJ concluded that Mr. Fonseca had not been disabled at any relevant time. Tr. 35.

## IV.     Issues Presented

Plaintiff's motion for reversal rests on two arguments – that the ALJ failed properly to evaluate the examining source opinions of Drs. Harrop and Armesto and that the ALJ erred in failing to specify the weight given to Dr. Armesto's opinion.

## V.     Standard of Review

---

[7] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable

clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[8] is not an "acceptable medical source."  20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006).  Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL 2263437, at *2.  An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function.  Id. at *2-3.  In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. § 404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

> **B.    The Five-Step Evaluation**

---

[8] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields.  SSR 06-03p, 2006 WL 2263437, at *1.

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. §
404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not
disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or
combination of impairments that significantly limit physical or mental ability to do basic work
activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. §
404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.
Part 404, Appendix 1, the claimant is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's
impairments do not prevent doing past relevant work, the claimant is not disabled. 20 C.F.R. §
404.1520(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past
work) prevent doing other work that exists in the local or national economy, a finding of disabled
is warranted. 20 C.F.R. § 404.1520(g). Significantly, the claimant bears the burden of proof at
Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart,
267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently
severe, the ALJ must consider the combined effect of all of the claimant's impairments and must
consider any medically severe combination of impairments throughout the disability
determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and
well-articulated findings as to the effect of a combination of impairments when determining
whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).
The claimant must prove the existence of a disability on or before the last day of insured status
for the purposes of disability benefits. Deblois, 686 F.2d at 79; 42 U.S.C. § 416(i)(3). If a
claimant becomes disabled after loss of insured status, the claim for disability benefits must be

denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st

Cir. 1986).

## VII.     Application and Analysis

Pointing to the regulations directing that more weight should be afforded to the opinion

of an examining source than that of a non-examining source, as long as the examiner's opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not

inconsistent with the other substantial evidence in [the] case record," 20 C.F.R. § 404.1527(c)(2),

Plaintiff argues that the ALJ erred in affording little weight to Dr. Harrop's mental/physical

opinion and in largely ignoring Dr. Armesto's consulting report.

The ALJ rejected Dr. Harrop's opinion because it is "wildly inconsistent with other

significant evidence of record."  Tr. 32-33.  This conclusion is well founded.  There is no

indication of what Dr. Harrop relied on, other than a one-time mental status examination and Mr.

Fonseca's self-report, a source that is tainted by the ALJ's unchallenged and well-founded

adverse credibility finding.  Examination of each component of the opinion reveals its flaws.

In support of his mental RFC opinion, Dr. Harrop set out the following premises for his

conclusions: that there was a history of ongoing psychiatric treatment with sustained depression

and fire setting since the age of 8; that there had been "frequent hospital E.R. presentations [due

to] panic and anxiety;" that Mr. Fonseca had permanent cognitive damage caused by "cardiac

problems and operations;" that Mr. Fonseca suffered from psychosis; that there was affirmative

evidence of suicidality, including slashing wrists; and that Mr. Fonseca had had hallucinations in

the past.  Tr. 333-41.  Not one of these extreme findings is supported by the treating medical

record.  For example, Dr. Harrop found that the heart surgery had caused permanent cognitive

damage, yet there is no suggestion of any pre-surgery evidence to buttress this finding nor a

scintilla of evidence that any of the post-surgery treating providers made any such conclusion or even raised any such concern. Similarly, while Mr. Fonseca frequently went to the emergency departments of various hospitals, it was never for anxiety and depression. Rather, as far as the record reveals, it was always for physical complaints, primarily chest pain. Importantly, as the ALJ correctly noted, Tr. 33, all of the psychiatric evaluations that were done during these encounters consistently yielded normal or unremarkable findings. See, e.g., Tr. 422, 490, 567. Whatever he might have told Dr. Harrop about a history of ongoing psychiatric treatment, psychosis, suicidality or hallucinations, Mr. Fonseca admitted to the ALJ that he had never had mental health treatment, other than medication from his primary care providers. Tr. 64.

Dr. Harrop's opinion regarding Mr. Fonseca's physical limitations is equally troublesome. It appears to be grounded in nothing more than the fact of the diagnosis of "cardiac problems." Tr. 334. Importantly, it references no physical examination or any laboratory or other diagnostic testing. Further, its conclusions are contradicted by the treating record, particularly the observations of the treating cardiologist that Mr. Fonseca is "feeling well" and that his mitral valve condition is "stable." Tr. 642. Thus, it does not approach the standard set out in the regulations for deference. 20 C.F.R. § 404.1527(c)(2) (opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record").

The only mistake made by the ALJ pertaining to Dr. Harrop is an obvious scrivener's error in a sentence where Dr. Harrop's name is used instead of that of Dr. Hughes. The passage states:

> The undersigned gives great weight to the opinions of Dr. Slavit and Dr. Harrop, and little weight to the opinion of Dr. Harrop. The opinions of Dr. Slavit and Dr. Harrop are more consistent with the findings on multiple examinations, as well as

> with the limited treatment . . . .  The limitations assessed by Dr. Harrop are wildly
> inconsistent with other significant evidence of record.

Tr. 32-33.  It is plain that it is Dr. Hughes who was meant to be paired with Dr. Slavit; both are

the non-examining psychologists and both concurred in the same opinion.  Tr. 82-83, 94-95, 110-

11, 125-26.  It is also unambiguously apparent that the ALJ meant to afford great weight to Drs.

Slavit and Hughes, and little weight to Dr. Harrop.  Under such circumstances, it is well settled

that reversal is not appropriate.  See Hudon v. Astrue, No. 10-CV-405, 2011 WL 4382145, at *4

(D.N.H. Sept. 20, 2011) (scrivener's error does not require reversal where ALJ's intent is

apparent) (citing Douglas v. Astrue, No. 1:09-1349, 2010 WL 3522298, at *3-5 (D.S.C. Sept. 3,

2010) (collecting cases)).

Turning to the consulting report of Dr. Armesto, Plaintiff relies on the ALJ's failure to

mention Dr. Armesto by name, the alleged failure to refer to his report, except for a passing

reference to the intact concentration/attention finding and to the MMSE-2 score, and the failure

to indicate the weight given to Dr. Armesto's opinions.  Tr. 27.  These criticisms are partially

wrong and partially right, but none is of the caliber to require remand.

First, while Plaintiff is right that the ALJ did not mention Dr. Armesto's name, she is

simply wrong when she argues that the ALJ failed to discuss and seriously consider Dr.

Armesto's findings.  Her argument seems to be grounded in a myopic examination of the ALJ's

Step 3 discussion (where she is right that Dr. Armesto is mentioned in only two sentences).  Tr.

27.  For example, Plaintiff completely ignores the ALJ's Step 2 finding of severity of "affective,

anxiety-related and learning disorders."  Tr. 25.  The only record reference to a diagnosis of

these three impairments is in Dr. Armesto's report;[9] moreover, the non-examining psychologists

both found them to be non-severe, so the ALJ's finding of severity had to be based on the

---

[9] The primary care providers prescribed medication based on diagnoses of depression and anxiety, e.g., Tr. 327, but
their records do not indicate who made the diagnosis.  They do not mention learning disorders.

acceptance of this aspect of Dr. Armesto's opinion. Compare Tr. 388, with Tr. 79, 91, 105, 120.

Plaintiff also completely ignores the ALJ's extensive discussion of Dr. Armesto's report

(referred to in the decision either by exhibit number or as the report of the "examining

psychologist") in the decision's lengthy RFC analysis, including the references to Dr. Armesto's

conclusions that there was no evidence of perceptual disturbances and that concentration and

attention were intact. Tr. 32. Plaintiff disregards the ALJ's correct observation that Dr.

Armesto's finding that Mr. Fonseca had symptoms of depression, anxiety, sleep disturbance and

decreased energy was somewhat inconsistent with the treating record, in that such symptoms

were not reported by his treating providers, all of whose mental status results were unremarkable.

Tr. 31-32. And Plaintiff completely ignores Drs. Slavit's and Hughes's express reliance on Dr.

Armesto's report, including both the low academic achievement scores and the MMSE-2 score,[10]

in developing their respective RFC opinions. Tr. 82 (discussion of claimant's education

background and Dr. Armesto's test scores); Tr. 94 (same); 110 (same); Tr. 125 (same). These

are the opinions to which the ALJ afforded great weight and on which he primarily relied for his

Step 2 and RFC findings.

One aspect of Dr. Armesto's report on which the ALJ did not expressly comment is the

GAF score of 47. Tr. 388. Such a score reflects "serious impairment" and is potentially

evidence of severity exceeding the moderate limitations opined to by the reviewing

psychologists. There are two reasons why this omission is not error. First, at the time Dr.

Armesto did his work, the use of the GAF score had been eliminated by the publication of DSM-

---

[10] One of the findings emphasized in Plaintiff's argument is Dr. Armesto's conclusion that "[c]laimant's ability to respond to customary work pressures is impaired." Tr. 385. However, Dr. Armesto's report does not describe the severity of this impairment, referring instead to his diagnoses of mood, anxiety, learning and personality disorders and the finding that Mr. Fonseca has "limited coping skills." Tr. 388. What matters is that Dr. Armesto's conclusion about an impairment in responding to work pressure was not ignored – it is incorporated into the Step 2 and RFC opinions of Drs. Slavit and Hughes, who opined to various non-exertional limitations based on Dr. Armesto's work.

V because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014).  See n.3, supra.  Second and more substantively, while he did not refer to the GAF score, the ALJ did contrast the severity of the symptoms Mr. Fonseca reported to Dr. Armesto with the many unremarkable mental status evaluations in the treating record.  Tr. 32.  Under such circumstances, the ALJ's reliance on the psychologists who opined based on the overall record, including both Dr. Armesto's report and the treating record, provides ample support for his conclusions.

Plaintiff's final attack on the ALJ's decision is his failure specifically to articulate the weight he gave to the opinions in Dr. Armesto's report.  However, such an omission is not error.  Unlike a treating source opinion or a nonexamining source opinion, adjudicators are not expressly required to articulate the weight given to the opinion of an examining source.  20 C.F.R. § 404.1527(c)(2), (e)(2)(ii).  Rather, the regulations require that such opinions must be considered.  Id. § 404.1527(b).  Accordingly, as long as the report is considered, courts are reluctant to find that an ALJ's failure to articulate or explain the weight given to the report of a consultative examiner necessarily amounts to error, never mind reversible error.  See Smythe v. Astrue, No. 10-251, 2011 WL 2580650, at *4-5 (D. Me. June 28, 2011), adopted, 2011 WL 2942733 (D. Me. July 21, 2011) ("Although the plaintiff's counsel, at oral argument, contended that a failure to address an examining source's RFC opinion is remandable error, he cited no authority for that point.") (citing Stoll v. Astrue, No. 1:10cv01326 DLB, 2011 WL 2036712, at *10 (E.D. Cal. May 23, 2011)).  Rather, if the omission is treated as error at all, it is at most harmless.

Here Dr. Armesto's consulting report was clearly carefully considered by the ALJ; moreover, its conclusions were either plainly accepted or the reason why they were not accepted is articulated in the decision. Tr. 31-32. Most importantly, the reviewing sources who have the specialized expertise to interpret Dr. Armesto's results in the context of the overall medical record expressly relied on the report and the ALJ relied on their opinions. Garza v. Astrue, No. CIV. M-09-133, 2013 WL 2432421, at *13 (S.D. Tex. June 3, 2013) (failure to mention weight of consultant harmless when the opinion supports the ALJ's decision); Ferland v. Astrue, No. 11-123, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011) (ALJ may rely on non-examining physician who "reviewed the reports of examining . . . doctors . . . and supported [his] conclusions with reference to medical findings.") (quoting Quintana v. Comm'r of Soc. Sec., 2004 WL 2260103, at *1 (1st Cir. 2004)); Hemphill v. Astrue, No. 10-1332-JAR, 2011 WL 2295025, at *3 n.27 (D. Kan. June 8, 2011) (no error when reliance on consultant opinion is clear from record). Under these circumstances, the ALJ's treatment of Dr. Armesto's report does not justify remand of this matter for further proceedings.

In sum, I find no material error in the ALJ's treatment of either the opinions of Dr. Harrop or the report of Dr. Armesto. Rather, I find that the ALJ's RFC determination is well grounded in substantial evidence and recommend that the resulting finding that Mr. Fonseca was not disabled at any relevant time should be affirmed.

**VIII.  <u>Conclusion</u>**

Based on the foregoing, I recommend that Plaintiff's Motion to Reverse with a Remand for Rehearing of the Commissioner's Final Decision (ECF No. 7) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be GRANTED. Any objection to this report and recommendation must be specific and must be served and filed

with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  <u>See</u>

Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner

constitutes waiver of the right to review by the district judge and the right to appeal the Court's

decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart,</u>

<u>Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
February 18, 2016